Matter of Workman v Dumouchel (2019 NY Slip Op 06248)





Matter of Workman v Dumouchel


2019 NY Slip Op 06248


Decided on August 22, 2019


Appellate Division, Fourth Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on August 22, 2019
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Fourth Judicial Department

PRESENT: CENTRA, J.P., CARNI, LINDLEY, TROUTMAN, AND WINSLOW, JJ.


365 CA 18-01516

[*1]IN THE MATTER OF GARY WORKMAN AND TALITHA WORKMAN, PETITIONERS-RESPONDENTS,
v
MICHELE DUMOUCHEL, RESPONDENT-APPELLANT. 






THE LAW OFFICES OF MATTHEW ALBERT, ESQ., BUFFALO (GRIFFIN DALT OF COUNSEL), FOR RESPONDENT-APPELLANT. 
ADAM R. MATTESON, LOWVILLE, FOR PETITIONERS-RESPONDENTS.


 Appeal from an order of the Jefferson County Court (Kim H. Martusewicz, J.), dated June 5, 2017. The order affirmed a judgment of the Town Court of the Town of Champion dated October 19, 2016, which adjudged that defendant's dog should be euthanized. 
It is hereby ORDERED that the order so appealed from is affirmed without costs.
Memorandum: Respondent appeals from an order of County Court that affirmed a judgment of Town Court directing the euthanization of respondent's dog Wally. The testimony and evidence at the hearing held pursuant to Agriculture and Markets Law § 123 established that Wally broke free of his tether, ran into petitioners' yard, and bit petitioners' three-year-old daughter. Even after the child's mother picked up the child, the dog continued to bite the child until the dog was finally restrained by respondent. The child sustained multiple lacerations to her lower leg, chest, and buttocks; the most severe laceration was a bite wound to her buttocks that required surgical intervention and approximately 30 stitches to repair. At the hearing, petitioners submitted the child's medical records and photographs of her injuries.
Our dissenting colleague contends that there was "a failure of the entire process" in this case and addresses issues that are not before us. The only issue raised by respondent is that County Court erred in affirming the judgment directing euthanasia because the child's injuries do not constitute a "serious physical injury" (Agriculture and Markets Law § 123 [3] [a]), and it is axiomatic that "parties to a civil dispute are free to chart their own litigation course" (Mitchell v New York Hosp., 61 NY2d 208, 214 [1984]; see also Misicki v Caradonna, 12 NY3d 511, 519 [2009]).
Respondent does not dispute that petitioners established by clear and convincing evidence that her dog is a "dangerous dog" (Agriculture and Markets Law §§ 108 [24] [a] [i]; 123 [2]). A justice may direct humane euthanasia of a dangerous dog if, inter alia, the dog, without justification, attacks a person, "causing serious physical injury"
(§ 123 [3] [a]; see People v Jornov, 65 AD3d 363, 367 [4th Dept 2009]). The Agriculture and Markets Law defines "serious physical injury" as "physical injury which creates a substantial risk of death, or which causes death or serious or protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ" (§ 108 [29]). The only issue here is whether the child sustained a "serious or protracted disfigurement" (id.). Inasmuch as those terms are used in the Penal Law definition of serious physical injury (see Penal Law § 10.00 [10]), reliance upon criminal cases involving what constitutes a serious or protracted disfigurement is appropriate. As petitioners correctly note, however, the Penal Law definition of a serious injury as, inter alia, a serious and protracted disfigurement (id.) does not apply here.
Contrary to respondent's contention, the evidence establishes that the child sustained a serious injury inasmuch as the dog attack caused serious or protracted disfigurement (see Matter of Town of Concord v Edbauer, 161 AD3d 1528, 1528-1529 [4th Dept 2018]). A "disfigurement" is "that which impairs or injures the beauty, symmetry or appearance of a person or thing; that which renders unsightly, misshapen or imperfect or deforms in some manner" (People v McKinnon, 15 NY3d 311, 315 [2010] [internal quotation marks omitted], quoting Fleming v Graham, 10 NY3d 296, 301 [2008]). "A person is seriously' disfigured when a reasonable observer would find her altered appearance distressing or objectionable" (id.). The standard is an objective one and depends on various factors, including the nature and the location of the injury (see id.). We conclude that the injuries sustained by the child here, particularly the bite wound to the buttocks that required surgery and approximately 30 stitches, constitute serious disfigurement (see Edbauer, 161 AD3d at 1528-1529). Although the analysis could end there, we conclude that those injuries also constitute a protracted disfigurement (see id.).
Moreover, contrary to respondent's contention, the location of the scars alone does not preclude a finding of serious or protracted disfigurement inasmuch as the location of the injury is but one factor to consider (see McKinnon, 15 NY3d at 315). Although respondent contends, and our dissenting colleague agrees, that the injuries do not rise to the level of serious disfigurement because most of the child's injuries are in locations generally concealed by clothing, there may certainly be times, such as in a school locker room, when the injuries are not concealed. Moreover, the location of the injuries here, in particular the laceration to the child's buttocks, actually supports the objectionable nature of the disfigurement inasmuch as it is "unusually disturbing" (McKinnon, 15 NY3d at 316). Respondent points out that the small wound to the child's lower leg is commonplace, such as that sustained through innocent horseplay or athletics, and would not cause an observer to find her appearance to be distressing or objectionable. But respondent's argument only highlights why the wound to the child's buttocks is a serious injury. Few people may see that scar, but those who do will find it "distressing" inasmuch as it is not a commonplace injury (id.).
We respectfully disagree with our dissenting colleague's conclusion that the court erred in determining that the child sustained a serious injury because there was no evidence that her scarring would be permanent or protracted. With respect to the child's injuries, the proof at the hearing consisted of the testimony of the child's parents, photographs of the child's injuries that appeared to be taken shortly after treatment, and the child's medical records. In concluding that the evidence was insufficient to show that the injuries would leave a permanent scar and asserting that the trier of fact should consider evidence of the child's appearance after a reasonable period of healing, our dissenting colleague relies primarily on civil cases involving "significant disfigurement" under Insurance Law § 5102 (d), which we find wholly inappropriate. Rather, as stated earlier, reliance upon criminal cases involving the interpretation of Penal Law § 10.00 (10) is appropriate, and People v Irwin (5 AD3d 1122 [4th Dept 2004], lv denied 3 NY3d 642 [2004]) is one such case. In Irwin, the victim was unable to testify at trial, but photographs depicting the sutured wounds to his arm and hand were admitted in evidence (id. at 1123). We held that "the jury could reasonably infer from that evidence that the sutured wounds resulted in permanent scars," and that the evidence was thus legally sufficient to establish that the victim sustained a serious physical injury (id.). Contrary to the interpretation of Irwin offered by our dissenting colleague, we did not determine that the jury could reasonably infer from the " [m]edical evidence' " that the sutured wounds resulted in permanent scars; rather, we made that determination based solely on the photographs depicting the injury. Thus, consistent with Irwin, we conclude that Town Court here could reasonably infer from the photographs and the fact that the child had 30 stitches that the injuries would result in permanent scarring.
We further note that hearings of this type must, by statute, be held swiftly (see Agriculture and Markets Law § 123 [2]), a requirement that is incompatible with our dissenting colleague's interpretation of what evidence is necessary to establish a serious or protracted disfigurement (§§ 108 [29]; 123 [3] [a]). A court is not "deprive[d] . . . of the evidence necessary to reach a proper determination" when a hearing is held shortly after a dog has unjustifiably attacked a person, as our dissenting colleague believes. Indeed, in this case, the evidence plainly established that Wally, without justification, attacked a three-year-old child and caused her serious injury, and County Court's order affirming the judgment directing euthanasia must be affirmed.
All concur except Troutman, J., who dissents and votes to modify in accordance with the following memorandum: I respectfully dissent. Town Court lacked the power to order the euthanasia of respondent's dog Wally, because petitioners failed to meet their burden of establishing that their child sustained "serious physical injury" (Agriculture and Markets Law § 123 [3] [a]), i.e., "serious or protracted disfigurement" (§ 108 [29]; cf. Matter of Town of Concord v Edbauer, 161 AD3d 1528, 1528-1529 [4th Dept 2018]). This was not merely a failure of the evidence, but a failure of the entire process. I would modify County Court's order by vacating the judgment directing euthanasia, and I would remit the matter to Town Court (hereafter, court) for further proceedings pursuant to Agriculture and Markets Law § 123 (2).
The relevant facts are largely undisputed. One day, Wally unexpectedly broke free from his tether, entered a neighboring backyard, and bit petitioners' three-year-old child, causing a laceration to her buttocks and other injuries. Immediately after the incident, the child was taken to the hospital, where the wound to her buttocks was washed out and closed "with no complications." Closure of the wound involved approximately 30 stitches. Shortly thereafter, photographs of the injuries were taken.
Three days later, petitioners commenced this proceeding pursuant to Agriculture and Markets Law § 123. One week after the incident, the child went to a follow-up appointment at the hospital. Hospital records from that visit stated: "Since discharge, [the child] has done well . . . No issues with the lacerations." Within two weeks of the incident, a friend of petitioners wrote a letter that included an update on the child's condition: "While [the child's] physical wounds appear to be healing nicely, I cannot say the same about the psychological and emotional wounds that have been inflicted on her mother." The friend urged swift retribution: "Most men I speak with say they would have personally killed the dog themselves."
A hearing commenced 15 days after the incident and took place over two days. On the first day, the child's father, who is one of the two petitioners, explained that the "nature" and "severity" of the injury was "due to luck," effectively acknowledging that the location of the injury reduced its seriousness. "[W]e were very lucky, due to the areas that were bitten." Shortly thereafter, the court adjourned the hearing for 13 days to permit respondent to retain an attorney. At the outset of the second day, respondent's attorney proposed a settled disposition: Wally would be neutered, he would receive training, respondent would construct a yard fence acceptable to petitioners, and, in the meantime, Wally would be removed from the neighborhood. The court rejected that proposal without consulting petitioners, stating: "I'm going to have the dog put down. That dog attacked that girl in her yard for no reason and injured her severely, and not just the physical, but there may be some issues down the road with her . . . being around animals, psychological issues . . . I don't want to take a chance whether that dog gets counseling . . . I don't believe it works . . . I never want to see it back and I don't want it in any neighborhood or around anybody. I think it's a dangerous dog and it fits all the criteria of a dangerous dog and so my alternative to this is, is to have the dog put down."
The court then agreed to hear testimony in order to avoid "a mess on appeal." Testimony by two of the parties shed no further light on whether the child sustained serious physical injury. Recent photographs of the injuries were not offered in evidence. An opinion of a certified behavioral expert was not offered. As expected, the court ordered euthanasia, noting that "the severity of this young girl's injuries and I think what the family's going to have to deal with in the future could be a real serious injury."
Initially, I must note my disappointment with the court's conduct in predetermining the result of the proceeding. Judges have an ethical responsibility to perform the duties of office impartially, without prejudice (see 22 NYCRR 100.3). The court failed in that responsibility.
In an Agriculture and Markets Law § 123 proceeding, the petitioner has the burden of establishing by clear and convincing evidence that a dog is a "dangerous dog" (§ 123 [2]). The standard of proof is higher than it was in the past. For much of the last century, the standard of proof in such a proceeding was by a preponderance of the evidence (see City of Hornell v Harrison, 192 Misc 2d 273, 273 [Hornell City Ct 2002]; Matter of LaBorie v Habes, 52 Misc 2d 768, 770 [Webster Just Ct 1967]). If a dog was determined to be a dangerous dog under that standard, the trial court was required to order either euthanasia or permanent confinement, and it had unqualified discretion to do either (see former § 121 [4]). In 2004, the legislature undertook [*2]a comprehensive reform of the statute (see L 2004, ch 392, § 3), raising the standard of proof to clear and convincing evidence, which is the standard of proof most appropriate when the "interests at stake in a . . . proceeding are both particularly important' and more substantial than mere loss of money' " (Santosky v Kramer, 455 US 745, 756 [1982], quoting Addington v Texas, 441 US 418, 424 [1979]). The legislature's adoption of that standard of proof in dangerous dog proceedings reflects that body's recognition that our society appreciates that the life of a dog has particular importance and inherent value greater than that of mere property.
Since the reform, if it is established that the dog is a dangerous dog, the court is empowered to order appropriate measures for the protection of the public (see Agriculture and Markets Law § 123 [2]). The court has a wide array of humane measures available to it. Those measures must include spaying or neutering and microchipping, and they may include humane confinement, leashing or muzzling in public, maintenance of an insurance policy, or evaluation by a certified behavioral expert and training as deemed appropriate by that expert (see id.). The court lacks the power to order the most drastic measure, i.e., euthanasia, unless the petitioner establishes the existence of one of the aggravating circumstances enumerated in the statute (see § 123 [3]). Such circumstances include those where the dog, without justification, attacked a person, causing "serious physical injury" (§ 123 [3] [a]), meaning, as relevant here, "serious or protracted disfigurement" (§ 108 [29]).
Respondent's sole contention on appeal is that County Court erred in affirming the judgment directing euthanasia because petitioners failed to establish serious or protracted disfigurement. I agree, and I have no difficulty in doing so. In my view, "it is obvious that the court's conclusions could not be reached under any fair interpretation of the evidence" (Cianchetti v Burgio, 145 AD3d 1539, 1540 [4th Dept 2016], lv denied 29 NY3d 908 [2017] [internal quotation marks omitted], quoting Thoreson v Penthouse Intl., 80 NY2d 490, 495 [1992], rearg denied 81 NY2d 835 [1993]).
Protracted disfigurement was not established here. A "disfigurement" is "that which impairs or injures the beauty, symmetry or appearance of a person or thing; that which renders unsightly, misshapen or imperfect or deforms in some manner" (People v McKinnon, 15 NY3d 311, 315 [2010] [internal quotation marks omitted]). A "protracted" disfigurement is one that is prolonged in duration (see Webster's Third New International Dictionary 1826 [2002]). Petitioners offered no evidence of the duration of the disfigurement. None whatsoever.
Contrary to the majority's reasoning, People v Irwin (5 AD3d 1122 [4th Dept 2004], lv denied 3 NY3d 642 [2004]) undermines its decision to affirm. In Irwin, the victim received multiple stab wounds inflicted by a 12-inch machete and, at trial, the People offered "[m]edical evidence," i.e., the testimony of the victim's treating surgeon concerning the potential for permanent injuries (id. at 1123). We thus concluded that the People offered legally sufficient evidence to establish the presence of permanent scarring (id.), citing only to People v Gagliardo (283 AD2d 964 [4th Dept 2001], lv denied 96 NY2d 901 [2001]), in which "[t]he trauma surgeon who treated the victim testified that the victim suffered lacerations . . . [that] resulted in permanent scarring" (id. at 964). To the extent that the majority's interpretation is correct, Irwin is an aberration and should not be followed. Indeed, we have never cited to Irwin for the proposition that the fact finder may conclude that an injury would result in permanent scarring based solely upon photographs of the injury taken shortly after the injury was inflicted, nor would I be inclined to do so.
Serious disfigurement likewise was not established. Contrary to petitioners' assertion, "serious disfigurement" has a well-established definition. The Court of Appeals, drawing on definitions in cases decided under the Workers' Compensation Law, has stated that "[a] person is seriously' disfigured when a reasonable observer would find [his or] her altered appearance distressing or objectionable. The standard is an objective one, but we do not imply that the only relevant factor is the nature of the injury; the injury must be viewed in context, considering its location on the body and any relevant aspects of the victim's overall physical appearance" (McKinnon, 15 NY3d at 315).
To establish serious disfigurement, at least one court has required some evidence of the victim's appearance after "a reasonable period of healing": "The time for determining whether a disfiguring condition is distressing or objectionable is not immediately at the time of [*3]disfigurement but, rather, after a reasonable period of healing. Otherwise, even the most non-permanent injury could so qualify due to transitory swelling, bruising and blood" (Fitzgerald v Varney, 60 Misc 3d 943, 946 [Warren County Ct 2018]). That rule is consistent with case law involving "significant disfigurement" under Insurance Law § 5102 (d). A disfigurement is not significant where an injury is "not readily observable to others" (Smyth v McDonald, 101 AD3d 1789, 1791 [4th Dept 2012]; see Koch v Richardson, 144 AD3d 1638, 1638-1639 [4th Dept 2016]; Heller v Jansma, 103 AD3d 1160, 1161 [4th Dept 2013]; cf. Garcia v County of Suffolk, 149 AD3d 812, 812 [2d Dept 2017]; Cross v Labombard, 127 AD3d 1355, 1357 [3d Dept 2015]) or where it subsides within a reasonable period of time (see Forster v Novic, 127 AD3d 605, 605 [1st Dept 2015]; Pecora v Lawrence, 28 AD3d 1136, 1137 [4th Dept 2006]; Wiegand v Schunck, 294 AD2d 839, 839 [4th Dept 2002]; cf. Feutcher v Composite Tr., 171 AD3d 647, 647-648 [1st Dept 2019]).
Petitioners failed to establish that their child was seriously disfigured. Disfigurement is a purely cosmetic type of injury, and thus the location of a disfigurement is a significant factor in determining its seriousness (see McKinnon, 15 NY3d at 315). A disfigurement that is unlikely to be seen is necessarily less serious than one that is likely to be seen. Here, the injury was highly unlikely to be seen by others. A laceration to the buttocks is especially easy to conceal, perhaps more so than any other conceivable injury, and it almost certainly would have remained concealed in public at all times. Moreover, the child healed quickly. Those who saw her one or two weeks after the incident reported that there were "[n]o issues" with the laceration and that it was "healing nicely." Recent photographs were not offered. The child's father even conceded that the location of the injury reduced its seriousness. Thus, petitioners failed to establish that a reasonable observer would have found their child's "altered appearance distressing or objectionable" (McKinnon, 15 NY3d at 315).
Petitioners rely on Edbauer, but that case is plainly distinguishable because it involved an injury resulting in 36 stitches to the victim's face and neck (see 161 AD3d at 1528). A person's face is especially difficult to conceal, and it would be unreasonable to expect a person to keep her face covered in public. The face is also where a disfiguring injury is most likely to attract unwanted attention and cause distress to others. Moreover, the victim in Edbauer actually appeared in the courtroom on multiple occasions over a five-month period and testified (see id.), thereby giving the court the opportunity to observe the progress of her injuries in person. That did not happen here.
Without evidence of serious physical injury, the court focused on psychological or emotional injuries that the child "may" develop in the future and reasoned that those injuries "could be a real serious injury." But emotional trauma does not establish a serious physical injury. A person may suffer "a horrifying experience that might well leave serious and permanent emotional scars. Scars of that kind, however," are not evidence of serious disfigurement or a physical injury of any kind (McKinnon, 15 NY3d at 316-317). Sympathy for this child, who endured a traumatic experience, is certainly appropriate, but it does not excuse the court from following the law faithfully or from conducting a fair proceeding. The law's preference is to use euthanasia only as a last resort to protect the public from dangerous dogs when alternative, humane methods have been considered and determined to be inadequate. It is not a form of retributive justice or a means of emotional catharsis.
Finally, the majority opines that, under my reasoning, it would be impossible to establish serious or protracted disfigurement in hearings of this type because they "must, by statute, be held swiftly." The majority's reasoning is empirically wrong and ignores the realities of litigation. We concluded that such disfigurement was established in Edbauer, and I do not take issue with that decision. That proceeding was held over a period of five months notwithstanding the language upon which the majority relies, which states that, upon the making of a complaint, a court "shall immediately" make a probable cause determination and then hold the hearing "within five days" (Agriculture and Markets Law § 123 [2]). Cases do not move that quickly. This case did not. Edbauer certainly did not. Indeed, the temporal guidelines in the statute predate the 2004 legislative reform and appear to be a relic. Not only did the legislative reform raise the evidentiary standard to proof by clear and convincing evidence, but it also conferred upon an aggrieved respondent the right of appeal (see L 2004, ch 392, § 3), which prolongs the resolution of these types of proceedings. Those aspects of the statute as it now exists are incompatible with the majority's interpretation, which would encourage hasty proceedings and [*4]thereby deprive the courts of the evidence necessary to reach a proper determination.
Entered: August 22, 2019
Mark W. Bennett
Clerk of the Court